COURT OF APPEALS OF VIRGINIA


Present:   Judges Haley, Beales and Alston
Argued by teleconference


COMMONWEALTH OF VIRGINIA

                                                MEMORANDUM OPINION[*] BY
v.      Record No. 0783-11-3                    JUDGE ROSSIE D. ALSTON, JR.
                                                    SEPTEMBER 13, 2011

AARON MATTHEW FLOYD


            FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
                        Joseph W. Milam, Jr., Judge

        Leah A. Darron, Senior Assistant Attorney General (Kenneth T.
        Cuccinelli, II, Attorney General, on brief), for appellant.

        James C. Martin (Martin & Martin Law Firm, on brief), for
        appellee.


        The Commonwealth appeals the trial court's pretrial order granting a motion to suppress

statements made by Aaron Matthew Floyd to police during questioning on May 3, 2010.  On

appeal, the Commonwealth argues that the trial court erred in granting the motion to suppress

because Floyd was not "in custody" for purposes of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966),

when police questioned him.  For the reasons that follow, we find that the trial court erred in

granting the motion to suppress and remand the case for a trial on the merits if the

Commonwealth is so inclined.

---

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

I.  Background[1]

When we review a trial court's denial of a motion to suppress, "[w]e view the evidence in a light most favorable to . . . the prevailing party below, and we grant all reasonable inferences fairly deducible from that evidence."  Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991).

So viewed, the evidence indicated that on May 3, 2010, shortly after 11:00 p.m., Corporal J.E. Garrett and Officer Larry Land of the Danville Police Department responded to a report of skateboarders behind a retirement home on Bridge Street in Danville.  When Garrett arrived, he observed five individuals whose ages he could not determine riding their skateboards near an entrance to the building.

As soon as Garrett arrived, the individuals picked up their skateboards as if they were about to leave.  Garrett saw Floyd walk near a concrete porch and discard a white cloth over the railing and onto the pavement.  Believing that this behavior was "odd," Garrett instructed the individuals to sit on the porch steps and told Land to watch them.  Meanwhile, Garrett went to investigate the item discarded by Floyd.  As Garrett approached the area where Floyd had discarded the cloth, Floyd said, "Ain't [sic] nobody over there."  Upon examination of that area, Garrett found a white T-shirt and an amber pill bottle with no name on it.  The pill bottle contained one pink pill imprinted "E613 10" and the metal end of a hose clamp.  Garrett suspected that the pill was contraband because the bottle lacked a prescription label.

Garrett then returned to his police car, placed the items on the hood of his car, and told Land to have Floyd come over to speak with him.  At that point, Garrett believed that Floyd was

---

[1] As the parties are fully conversant with the record in this case and because this memorandum opinion carries no precedential value, this opinion recites only those facts and incidents of the proceedings as are necessary to the parties' understanding of the disposition of this appeal.

not free to leave; however, Garrett never stated this belief to Floyd. When Floyd approached the car, he said, "I'm in trouble, aren't I?"

A brief exchange then occurred between Garrett and Floyd. At the hearing on the motion to suppress, Garrett described the exchange as follows:

> I walked up to the front of my vehicle, and set the two items on the hood. Officer Land instructed [Floyd] to come up. [Floyd] walked up to the side of the fender where the two items lay on the hood, and he said, "I'm in trouble, aren't I[?]" And I said, "This yours[?]" And he replied, "Yes." I asked him if he had a prescription for it, and he said, "No." I asked him what it was, and he said it was a strong pain reliever. I asked him where he got it, and at first he didn't want to answer, but then he told me he got it where he worked, at Western Sizzlin on Riverside. He had purchased the tablet from a young man named John Pyron, described . . . what he drove, and told me he had paid ten dollars for it.

Floyd also described Pyron's appearance after further questioning by Garrett.

After the discussion, Garrett did not arrest, handcuff, or issue Floyd a summons that night. Garrett believed Floyd returned home after their encounter.

Garrett subsequently confirmed that the pink pill he found was Oxymorphone, a Schedule II controlled substance. Over two months later, Floyd was arrested on July 20, 2010, for knowingly or intentionally possessing the Oxymorphone, a Schedule II controlled substance, without a prescription in violation of Code § 18.2-250.

Before trial, Floyd moved to suppress his May 3, 2010 statements to Garrett following the statement, "I'm in trouble, aren't I?" on the ground that the statements were obtained in violation of the Fifth Amendment.[2] After a hearing on the motion to suppress, the trial court found that Floyd was lawfully temporarily detained under Terry v. Ohio, 392 U.S. 1 (1968). However, the trial court also found that Floyd's detention was akin to a formal arrest and

---

[2] Floyd also moved to suppress his statements on the ground that he was unlawfully detained and moved to suppress the contraband under the Fourth Amendment. The trial court denied both of these motions, and they are not before the Court in the instant appeal.

consequently the Fifth Amendment required that Garrett provide <u>Miranda</u> warnings before questioning Floyd. As a result, the trial court granted Floyd's motion to suppress his statements to Garrett. This appeal followed.

## II. Analysis

On appeal, the Commonwealth contends that Floyd was not in custody when Garrett questioned him and so <u>Miranda</u> warnings were not required.

> Under <u>Miranda</u>, before a suspect *in police custody* may be questioned by law enforcement officers, the suspect must be warned that he has a right to remain silent, that any statement he makes may be used as evidence against him, and that he has a right to have an attorney, either retained or appointed, present to assist him.

<u>Dixon v. Commonwealth</u>, 270 Va. 34, 39, 613 S.E.2d 398, 400 (2005) (emphasis added). "<u>Miranda</u> warnings are implicated only during a custodial interrogation." <u>Bailey v. Commonwealth</u>, 259 Va. 723, 745, 529 S.E.2d 570, 583 (2000).

Whether a person is "in custody" for purposes of one's rights pursuant to <u>Miranda</u> is a mixed question of law and fact. <u>Thompson v. Keohane</u>, 516 U.S. 99, 102 (1995). In our analysis, "we are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them." <u>McGee v. Commonwealth</u>, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*) (citing <u>Ornelas v. United States</u>, 517 U.S. 690, 699 (1996)). However, "we review *de novo* the trial court's application of defined legal standards, such as . . . 'custodial interrogation,' to the particular facts of a case." <u>Ford v. Commonwealth</u>, 28 Va. App. 249, 255, 503 S.E.2d 803, 805 (1998) (citing <u>Ornelas</u>, 517 U.S. at 700; <u>Shears v. Commonwealth</u>, 23 Va. App. 394, 398, 477 S.E.2d 309, 311 (1996)).

"Whether a suspect is 'in custody' under <u>Miranda</u> is determined by the circumstances of each case, and 'the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'" <u>Harris v. Commonwealth</u>,

27 Va. App. 554, 564, 500 S.E.2d 257, 262 (1998) (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)) (internal quotation marks omitted).  The determination of whether a suspect is in custody "'depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'"  <u>Id.</u> (quoting <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994)).  Thus, the question is whether a "reasonable person in the suspect's position would have understood that he or she was under arrest"; if so, <u>Miranda</u> warnings are required before questioning.  <u>Id.</u>

This Court has identified a number of circumstances to be considered when determining whether or not a suspect was in custody, including

> (1) the manner in which the individual is summoned by the police, (2) the familiarity or neutrality of the surroundings, (3) the number of officers present, (4) the degree of physical restraint, (5) the duration and character of the interrogation, and (6) the extent to which the officers' beliefs concerning the potential culpability of the individual being questioned were manifested to the individual.

<u>Id.</u> at 565, 500 S.E.2d at 262.  "However, no single factor alone may necessarily establish custody for <u>Miranda</u> purposes, and not all factors may be relevant in a given case."  <u>Wass v. Commonwealth</u>, 5 Va. App. 27, 33, 359 S.E.2d 836, 839 (1987).

The Supreme Court of the United States has also discussed the applicability of <u>Miranda</u> in the context of lawful <u>Terry</u> stops.  Specifically, the Court has held that, during a <u>Terry</u> stop, a police officer

> may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. . . .  The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that <u>Terry</u> stops are subject to the dictates of <u>Miranda</u>.

<u>Berkemer v. McCarty</u>, 468 U.S. 420, 439-40 (1984) (footnotes omitted); <u>see also</u> <u>Bosworth v. Commonwealth</u>, 7 Va. App. 567, 572, 375 S.E.2d 756, 759 (1989) ("Although an accused in

custody must be advised of certain constitutional rights prior to being questioned, a <u>Terry</u> stop of a person to investigate a suspicion is not necessarily subject to the requirements of <u>Miranda</u>." (citation omitted)).

We find the case of <u>Ford v. Commonwealth</u>, 28 Va. App. 249, 503 S.E.2d 803 (1998), instructive in its analysis and controlling in the instant case. In <u>Ford</u>, a detective observed the defendant walking with two women in the parking lot of a shopping mall and carrying a white plastic bag. 28 Va. App. at 253, 503 S.E.2d at 804. As he approached a wooded area on the east side of the parking lot, the defendant separated from the two women and entered the wooded area. <u>Id.</u> He then exited the wooded area and returned to the two women without the white plastic bag, and all three walked into the mall. <u>Id.</u> The detective went into the woods and found a white plastic bag similar to the one he had seen the defendant carry into the woods hidden underneath two old mattresses. <u>Id.</u> Inside the bag were five pieces of women's clothing with store tags attached. However, there was no sales slip or receipt inside the bag. <u>Id.</u> at 253, 503 S.E.2d at 804-05.

When the defendant and the women exited the mall a short time later, the detective and three uniformed police officers stopped them by approaching them in their police cruisers with blue police lights activated. <u>Id.</u> at 253-54, 503 S.E.2d at 805. The detective approached the defendant and asked for his name and identification, which the defendant did not provide. <u>Id.</u> at 254, 503 S.E.2d at 805. The detective also asked the defendant to explain his actions in the parking lot; the defendant denied being on mall property, carrying a bag, or knowing the two women with him. <u>Id.</u> The defendant was not read his <u>Miranda</u> rights until thirty minutes after he was questioned. <u>Id.</u>

In <u>Ford</u>, this Court held that the defendant was not in custody when the detective questioned him. <u>Id.</u> at 257, 503 S.E.2d at 806. In so holding, the Court noted that (1) the

defendant "was detained on a public street in the middle of the afternoon"; (2) "[a]lthough [the defendant] was not free to leave, he was not restrained, handcuffed, or searched"; (3) although four officers were present, there were three suspects; (4) the defendant "was not surrounded, and only [the detective] asked him questions"; (5) the "police may, within the scope of an investigative stop, ask a suspect to explain suspicious circumstances"; (6) the detective "never told the [defendant] that he was being apprehended for alleged grand larceny"; and (7) the defendant's thirty-minute detention was irrelevant to the custody determination. Id.

Similarly, in the instant case, (1) Floyd was detained in a public area, in view of at least four other people, albeit at night; (2) Floyd was not physically restrained, handcuffed, or searched, although he was told to sit on porch steps and another officer was told to watch him; (3) although two officers were present, there were five individuals also present; (4) Floyd was not surrounded, and only Garrett questioned him; (5) Garrett never told Floyd he was under arrest or not free to leave[3]; and (6) Floyd was detained for only a brief period of time and actually left the scene of the incident without being arrested or issued a summons.

The evidence in the instant case also shows that Garrett singled out Floyd among a group of five individuals for police questioning, asked Floyd to move a short distance from the porch steps to the outside of the patrol car, and confronted Floyd with evidence of his guilt, i.e., the T-shirt, pill bottle, and pill, during questioning. This Court has held that whether a defendant was singled out for questioning and confronted with evidence of his guilt is one of the proper inquiries in assessing whether an individual is in custody. Taylor v. Commonwealth, 10 Va. App. 260, 268, 391 S.E.2d 592, 597 (1990) (finding that a defendant was not in custody during police questioning in part because "[t]he question was put generally [to a group of four

---

[3] The trial court correctly pointed out that the initial interaction between Floyd and Garrett was a lawful Terry stop. This determination was not appealed. Thus, as part of an investigatory stop, Garrett was entitled to ask Floyd to explain suspicious circumstances.

people] and was not directed to any one specific person"); Wass, 5 Va. App. at 33, 359 S.E.2d at 839 (stating that "the extent to which [a defendant] is confronted with evidence of guilt" is a factor to consider in determining custody).

However, no single factor is determinative when evaluating whether a defendant is in custody when questioned; instead, "[t]he totality of circumstances must be considered." Wass, 5 Va. App. at 32, 359 S.E.2d at 839. In addition, "the fact that an investigation has focused on the defendant does not determine custody." Bosworth, 7 Va. App. at 573, 375 S.E.2d at 759. Moreover, the fact that Floyd was asked to move a short distance from the porch steps to the patrol car to speak with Garrett does not suggest that he was in custody. See Nash v. Commonwealth, 12 Va. App. 550, 553, 404 S.E.2d 743, 744 (1991) (finding that the defendant was not in custody when he was returned to the scene of a car accident a quarter of a mile away and questioned about the accident).

The evidence in this case suggests that Garrett implicitly manifested his belief in Floyd's guilt by singling Floyd out for questioning and confronting him with the T-shirt, pill bottle, and pill during questioning. If viewed in isolation, this factor may alone weigh in favor of finding that Floyd was in custody. However, we must view the totality of the circumstances and not just one factor in isolation. Viewing the totality of the circumstances here, Floyd's freedom of movement was not restrained to "the degree associated with formal arrest." Beheler, 463 U.S. at 1125. Therefore, we hold that Floyd was not in custody when Garrett questioned him.[4]

---

[4] The holding of J.D.B. v. North Carolina, 131 S. Ct. 2394 (2011), is not relevant in the instant case. In J.D.B., the Supreme Court held that the age of a child subjected to police questioning is relevant to the custody analysis of Miranda. 131 S. Ct. at 2398-99. J.D.B. "was a 13-year-old, seventh grade student attending class" at a middle school when he was removed from his class and then questioned by police. Id. at 2399. In the instant case, Floyd was 20 years old at the time he was questioned and, although Garrett could not immediately determine Floyd's age from his appearance, the record indicates that Floyd was 6'3" tall and weighed 195 pounds.

Because we hold that Floyd was not in custody, Garrett was not required to provide Miranda warnings to Floyd before questioning him.  Thus, the trial court erred in granting Floyd's motion to suppress, and we reverse the suppression order and remand for trial if the Commonwealth be so inclined.

Reversed and remanded.